# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

DANIEL M. WOODS, :
:
        Plaintiff, :
:
v. : Civ. No. 08-397-LPS
:
CORRECTIONAL MEDICAL SERVICES, INC., :
et al., :
:
        Defendants. :

Daniel M. Woods, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

James Edward Drnec, Esquire, Balick & Balick, L.L.C., Wilmington, Delaware. Counsel for Defendants.

**MEMORANDUM OPINION**

March 31, 2011
Wilmington, Delaware

{signature}
**Stark, District Judge:**

## I. INTRODUCTION

Plaintiff, Daniel M. Woods ("Woods"), an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983. He also raises supplemental state law claims. Woods appears *pro se* and has been allowed to proceed *in forma pauperis*. (D.I. 9) Pending before the Court are cross-motions for summary judgment and Defendants' Motion to Strike.[1] (D.I. 118, 122, 130) The Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment.

## II. BACKGROUND

Woods alleges deliberate indifference to his serious medical needs, particularly in the delay or failure to provide treatment for Hepatitis C. He alleges that medication was withheld despite physicians' orders, and that nursing staff failed to rotate injections, causing infections, scarring, and complications. (D.I. 2) Named as defendants are Correctional Medical Services,

---

[1]The Court will grant the Motion to Strike. (D.I. 130) Woods asks the Court to consider a letter regarding the investigation of five Delaware prison facilities pursuant to the Civil Rights of Institutionalized Persons Act, which authorizes the federal government (specifically, the Civil Rights Division of the United States Department of Justice ("DOJ")) to identify and root out systemic abuses. The investigation found substantial civil rights violations at four of the five facilities, one of which was the Delaware Correctional Center, now known as the VCC. The investigation resulted in the entry of a memorandum of agreement on December 29, 2006, between DOJ and the State of Delaware regarding the four institutions. Paragraph I.F of the agreement provides that it may not be used as evidence of liability in any other legal proceeding.

1

Inc. ("CMS"),[2] Lisa Sugar ("Sugar")[3], Shari Cain ("Cain"), Jamilla McKinzie ("McKinzie"), and Richard Okonibo ("Okonibo") (collectively "Medical Defendants").[4] During his deposition, Woods clarified his claims as follows: (1) health care providers used the wrong-size needle for Interferon injections; (2) health care providers failed to rotate injection site; (3) Sugar refused to treat him; (4) he was not provided physician-ordered high protein/high calorie diets or supplement drinks; (5) Cain inappropriately changed the physician ordered supplement drink; and (6) denial of medication.[5] (D.I. 118 Pl.'s Dep. at 17, 21, 27-32)

Plaintiff was diagnosed with Hepatitis C in 2004. On May 3, 2007, Woods was referred to Dr. McDonald ("Dr. McDonald") to initiate Interferon protocol. The protocol began once Dr. McDonald wrote the orders; treatment consisted of Pegasys and Ribavirin injections.[6] Approximately one year later, on May 14, 2008, Dr. McDonald wrote orders to discontinue the medication. Lab work performed on June 24, 2008 indicated successful treatment, with undetectable viral loads and liver enzymes ALT and AST within normal limits. When Dr. McDonald saw Woods on July 2, 2008, he wrote in his notes "spoke with Mr. Wood re: labs,

---

[2]CMS was the medical service contract provider for the Delaware Department of Correction ("DOC") from July 1, 2005 through June 30, 2010. First Correctional Medical Services was the medical service contract provider from July 1, 2002 through June 30, 2005.

[3]Misspelled on the court docket as "Suger."

[4]Several defendants have been dismissed. (*See* D.I. 22, 117)

[5]This appears to be based upon events that occurred after the filing of the complaint wherein Woods went without pain medication for two weeks in August 2009 due to an oversight. (D.I. 123) The claim is not properly before the Court and is not considered.

[6]Pegasys and Ribavirin are used to treat Hepatitis C infection. *Physician's Desk Reference* 2903, 2917 (63d ed. 2009).

2

reevaluation of anemia and follow up. Patient is aware of good labs. Negative Hep C viral load. Normal function. No anemia and he knows follow up will be with regular physicians unless virus returns." Woods's viral load was undetectable in blood work performed on February 10, 2009. Dr. McDonald discharged Woods from the Hepatitis C Infectious Disease Clinic on July 23, 2009.[7] (D.I. 118 Pl.'s Dep. at 16; D.I. 120)

During his year of treatment, Woods underwent testing, was seen by medical personnel and at the chronic care clinic, doctors' orders were issued, and dietary needs were addressed, as follows: in 2007 on May 3 and 5; June 6, 26, and 30; August 2, 3, 8, 10, 21, and 29; September 12; October 2 and 23; November 9, 22, 26, 27, and 30; December 4, 5, and 12; and in 2008 on January 7, 9, 17, 22, 25, 26, and 29; February 1, 4, 6, 11, 13, 14, 18, 22, and 29; March 3, 5, 11, 14, 28, and 31; April 2, 14, 18, and 23; May 4, 7, 15, 19, and 21; and June 2, 5, 11, 12, 17, 18, and 24. (D.I. 120)

Prior to the referral for Hepatitis C treatment, orders were written for Woods to receive Neurontin,[8] a high calorie/high protein diet, and the dietary supplement Boost on a daily basis. The medication administration record ("MAR") indicates that during the year he was treated for

---

[7]Woods agrees that the treatment was successful. (D.I. 118 Pl.'s Dep. at 21)

[8]Medical records indicate the medication was prescribed for pain management due to arm pain.

3

Hepatitis C, Woods was administered Neurontin, multivitamins, Ribavirin, Elavil,[9] Meloxicam,[10] Darbepoetin,[11] Amitriptyline,[12] Peginterferon,[13] Clotrimazole cream,[14] Mobic,[15] Eucerin cream,[16] Aranesp,[17] Tums, Augmentin,[18] Colace,[19] Ferrous Sulfate,[20] Calcium Carb,[21] Doscusate,[22] and

---

[9]Because the Neurontin was no longer effective, Woods was prescribed a combination of Elavil, also known as amitriptyline, and Mobic for pain management. (D.I. 120) Typically Elavil is used to treat depression and Mobic, also known as Meloxicam, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Physician's Desk Reference* 863, 2177 (63d ed. 2009).

[10]*See* n.9, *supra*.

[11]Used to treat anemia. *Physician's Desk Reference* 564 (63d ed. 2009).

[12]*See* n.9, *supra*.

[13]Antiviral drug treatment for Hepatitis C. *Physician's Desk Reference* 2903 (63d ed. 2009).

[14]Prescribed to treat a skin infection on Woods' chest. *Id.* at 2881.

[15]*See* n.9, *supra*.

[16]A moisturizer used to help dry skin. When Woods was seen by Dr. McDonald in December 2007, he noted dry skin and ordered the cream on December 12, 2007. April 2008 notes indicate that Woods used the cream to treat a skin rash.

[17]Used to treat anemia. *Physician's Desk Reference* 564 (63d ed. 2009).

[18]An antibiotic used to treat bacterial infections, such as sinusitis, pneumonia, and bronchitis. *Id.* at 1327.

[19]A stool softener. *See* www.nlm.nih.gov.

[20]Used to treat iron deficiency anemia. *Physician's Desk Reference* 2546 (63d ed. 2009).

[21]A calcium dietary supplement. *Id.* at 3173.

[22]A stool softener. *Id.* at 2175.

Hydrocortisone cream.[23] He was also prescribed either Boost or Resource 2.0, dietary supplements. (D.I. 120, D.I. 123)

Woods submitted sick call requests or grievances on numerous issues including complaints of pain and pain medication, high calorie/high protein diet, requests for snacks, infected shoulders, and missed injections, as follows: in 2007 on May 9 and 31; June 11; August 3, and 8; September 3; October 6, 14, and 20; November 8, 20, 26, 27, 28, and 29; and December 3; and in 2008 on January 6, 7, 9, 12, 17, 23, and 28; February 7 and 17; March 3, 4, 6, 10, 11, 12, 13, 15, 21, and 24; April 1 and 7; May 14 and 30; and June 8. (D.I. 120 Ex. B; D.I. 123)

The January 2008 sick call requests indicate that Woods was scheduled to see Sugar, a nurse practitioner, on January 17, 2008. Woods' sick call request dated January 12, 2008 states, "this is my third sick call." Sugar authored a noted on January 17, 2008, indicating that she went to see Woods after sick call on January 9, 2008, but he was in the shower and did not want to come down. Sugar concluded that Woods was "probably not acute at this time." The note states that Sugar would have nursing check Woods' blood pressure and order an EKG with a follow-up on January 18, 2008. (D.I. 123)

On January 16, 2008, Woods submitted a grievance complaining of denial of proper medical treatment by the medical staff. The grievance was considered "non-grievable." On March 13, 2008, Woods submitted a grievance complaining about the lack of medical care by the medical department. Woods refused to discuss the issue and the matter was considered resolved after Woods stated that the grievance was "part of his civil action." One of Woods' medical

---

[23]Used to relieve the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions. *Id.* at 1140. It was first prescribed to Woods on April 23, 2008.

grievances was upheld, with an October 7, 2008 decision noting that he "has had several lapses in chronic care with February 13, 2008 appointment indicating thirty day follow-up and not seen until June 18, 2008. That appointment indicates that Woods is now past due for appointment. No orders for cream since April 23, 2008." (D.I. 2, 123)

Woods submitted numerous grievances complaining that he did not receive a high calorie/high protein diet, such snacks, or nutritional supplement drinks, and complained this resulted in loss of weight due to his Hepatitis C treatment. When Woods began his Interferon treatments, Dr. McDonald wrote an order for Woods to receive Boost, two cans daily. In July, CMS stopped providing dietary supplements in the form of two cans of Boost or Resource each day and began providing patients a new supplement, Resource 2.0, which requires only one can daily to achieve the same results. On August 1, 2007, Cain noted a clarification of Dr. McDonald's order: "change supplement to Resource 2.0 one can x 30 days." Dr. Desrosiers signed off on the order on August 2, 2007. According to Cain, her clarification did not change Dr. McDonald's order. Dr. McDonald stated that the August 1, 2007 order signed by Dr. Desrosiers correctly clarified his order that Woods' supplement was to be changed from two cans of the supplement Boost daily to one can of Resource 2.0 per day. He agrees that Cain did not inappropriately change his order. (D.I. 118 Cain Aff., McDonald Aff.; D.I. 120, 123)

On August 8, 2007, Woods submitted a sick call request after he was informed that he would no longer receive the two resource drinks. He noted that Dr. McDonald ordered two drinks per day due to his illness and complained, "how can a nurse change a doctor's order." Medical notes indicate that on August 21, 2007, a nurse "spoke with inmate explained Resource 2.0 and Boost difference." Woods received two cans of Boost per day until Resource 2.0 became

6

available, and he then received one can per day as ordered. He also submitted a grievance on August 8, 2007, which was resolved in his favor on June 4, 2008, noting "inmate orders in September 2007 indicate inmate to receive drinks one can two times per day. The MAR does not indicate that inmate is provided with drinks on a daily basis." A grievance submitted by Woods on March 3, 2008 was resolved in his favor on July 16, 2008, and stated that "medical vendor is responsible for ensuring no lapses in MD orders for medications, snacks or any other form of treatment ordered by the Provider."

Following completion of the Interferon treatment, a nutritional assessment indicated that Woods was overweight, his visceral protein status was within normal limits, and he was not a nutritional risk. Woods, however, continued to request snacks and pain medication, and made complaints related to his treatment in August, September, October, and December 2008, as well as in January and February 2009. Woods' medical record indicates that two days before he began the Interferon protocol, on May 3, 2007, he weighed 190 pounds, and on June 18, 2008, after completion of the treatment, he weighed 189 pounds, just one pound less.[24] It is Dr. McDonald's opinion that Woods did not have any medical need for a high calorie/high protein diet with snacks after the end of his Interferon treatment. (D.I. 120 Ex. B; D.I. 118 McDonald Aff.; D.I. 123, 125)

Woods submitted a sick call request on January 23, 2008, and complained for the first time of a shoulder infection. Medical records do not indicate that Woods had an infection, but indicate treatment of a rash. Woods testified that the failure to rotate the Interferon injections

---

[24]Medical records indicate that Woods lost weight during the year he was treated for Hepatitis C. When Dr. McDonald saw Woods on December 12, 2007, he noted that Woods had lost seventeen pounds and weighed 174 pounds. (D.I. 123)

7

caused an infection on the back of his right arm, but clarified "nobody really said it was an infection." (D.I. 118 Pl.'s Dep. at 26-27) Woods was seen on January 28, 2008, with complaints of shortness of breath, difficulty in breathing, yellow green exudates, full lung fields, tender sinuses, and sore throat. Sugar obtained a throat culture and ordered Augmentin, an antibiotic, to treat otitis and sinusitis. In addition, a chest x-ray was ordered to rule out infection. At the time, Woods complained that his arm was sore and notations were placed in Woods' medical records in January and February 2008 to rotate Hepatitis treatment injection sites. (D.I. 120, 123)

On September 7, 2008, Woods asked for additional hydrocortisone cream to treat the area where he received injections during his Interferon treatments. The order had expired and Woods was scheduled to see Dr. McDonald for a new prescription. Woods submitted a grievance on April 1, 2009, complaining that he was not advised of the after-effects of Alpha-Interferon and that he was blamed for not telling medical personnel to rotate his injection sites.[25] The grievance was upheld after a review of the medical record did not document education about Hepatitis C and its treatment including side effects of medications. Woods had filed similar grievances on January 1 and 17, 2008, and complained that the medical department failed to properly treat his condition and allowed nurses to improperly inject him. The grievances were denied noting that the physician had addressed the issue on February 6, 2008, the nurses are trained, and "nurses have been doing it properly since that time." Woods testified that the wrong size needles were used and the syringe could not hold the entire dose of medication. (D.I. 2; D.I. 118 Pl.'s Dep. at 17; D.I. 123) Dr. McDonald reviewed Woods' complaint, deposition transcript, and medical

---

[25]During his deposition, Woods testified that Dr. McDonald informed him of side effects when undergoing the Interferon protocol, including heart fluctuation, headaches, fatigue, diminished appetite, inability to sleep, aching bones, and rash. (D.I. 118 Pl.'s Dep. at 24)

8

chart. He states, to a reasonable degree of medical probability, that Woods did not suffer an infection on his chest, arms, or any other part of his body during his Hepatitis C treatment. Dr. McDonald prescribed Eucerin and Clotrimazole for rash and dry skin, side effects of the treatment and/or disease. He states that Woods received an appropriate dose of medication sufficient to successfully treat his Hepatitis C. He further states that fatigue, nausea, body aches, dizziness, soreness at injection sites, scarring from injections, headaches, accelerated heart rate, blurry vision, loss of appetite, rash, and weight loss are all common, known side effects of Interferon treatment for Hepatitis C and were not caused by improper injections. Dr. McDonald was unable to determine a cause for Woods' nosebleeds, but states that they were not caused by a failure to rotate injection site, or by any lack of diet or nutritional supplement. (D.I. 118 McDonald Aff.)

## III. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

9

Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

The rules are no different when there are cross-motions for summary judgment. *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

## IV. DISCUSSION

Medical Defendants move for summary judgment on the grounds that: (1) Woods cannot maintain a claim for medical negligence pursuant to Delaware law because he failed to file the required affidavit of merit; (2) Woods cannot recover against CMS in the absence of any policy or custom of deliberate indifference; (3) the failure to inject the rotation site claims fail because Woods did not have an infection and the other side-effects he experienced were common, known side effects of Interferon treatment; (4) the record does not support a finding that Cain improperly changed a physician's order but, rather, that she wrote a clarification of the order; and (5) Woods failed to exhaust his administrative remedies with regard to his claims against Sugar and, in the alternative, there are no facts demonstrating she was deliberately indifferent to any serious medical need. (D.I. 119) Woods moves for summary judgment on the grounds that: (1) there is no genuine issue of material fact that CMS failed to act to affirmatively stop Defendants from injecting him in the same site, and its policy was so inadequate it can reasonably be said that CMS was deliberately indifferent to Woods' serous medical needs; (2) Dr. McDonald's affidavit filed in support of Medical Defendants' motion is inadequate; (3) Woods never received a single correct injection during the time he received Interferon treatment; (4) Cain changed physicians' orders without consent or authority; (5) Woods suffered as a result of Medical Defendants' actions, including by losing seventeen pounds during his treatment, and still has Hepatitis C, albeit undetectable; and (6) Woods' grievances were directed to all medical staff.

11

### A. Medical Negligence

In Delaware, medical malpractice is governed by the Delaware Health Care Negligence Insurance and Litigation Act (the "Act"). 18 Del. C. §§ 6801-6865. Woods did not address the application of the Act to his claims.

Pursuant to the Act, when a party alleges medical negligence, Delaware law requires the party to produce an affidavit of merit with expert medical testimony detailing: (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury. *See Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 804 (D. Del. 2003) (citing *Green v. Weiner*, 766 A.2d 492, 494-95 (Del. 2001)); 18 Del. C. § 6853. Because Woods alleges medical negligence, at the time he filed the Complaint he was required to submit an affidavit of merit as to each defendant, signed by an expert witness. *See* 18 Del. C. § 6853(a)(1).

The Court has reviewed the record and finds that Woods failed to accompany the Complaint with an affidavit of merit as required by 18 Del. C. § 6853(a)(1). Accordingly, the Court will grant Medical Defendants' Motion for Summary Judgment as to Woods' medical malpractice claims.

### B. Eighth Amendment

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim for a violation of the Eighth Amendment, an inmate must allege (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *See id.*, 429 U.S. at 104; *Rouse v.*

12

*Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05.

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000). An inmate's claims against members of a prison medical department are not viable under § 1983 when the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment or maintains that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle*, 429 U.S. at 107. Moreover, allegations of medical malpractice are not sufficient to establish a Constitutional violation. *See White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (stating negligence is not compensable as Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

### 1. **Nutritional Supplement**

The individual Medical Defendants argue that Woods' nutritional supplement claims are not supported by the record. Woods argues that Cain unilaterally changed Dr. McDonald's orders regarding his dietary supplements from two cans to one. The record reflects that, at various times during his treatment, Woods was prescribed either Boost or Resource 2.0. In addition, Dr. McDonald would order one can of Boost and then change the order to increase or

13

decrease the number of cans of Boost per day. It is undisputed that one can per day of Resource 2.0 equals two cans per day of the Boost supplement.

Woods claims that Cain improperly changed Dr. McDonald's order of two cans per day of Boost to one can per day of Resource 2.0, but Dr. McDonald is unequivocal that Cain did not inappropriately change his order and that Dr. Desrosiers' subsequent order clarified the change in the type of supplement and the amount received daily.

The record further reflects that, upon occasion, Woods did not receive the supplement because it was out of stock or a nurse did not bring it to him. However, more often than not, he was regularly provided the supplement. Although Woods sustained some weight loss during his treatment, he regained the weight and by the end of treatment he weighed almost the same as he had when the treatment began. At the most, the individual Medical Defendants' actions with regard to Boost and/or Resource 2.0 were negligent, but no reasonable jury could find deliberate indifference on their part. Therefore, the Court will grant Medical Defendants' Motion for Summary Judgment on this issue.

### 2. **Failure to Treat**

Medical Defendants seek summary as to the claims against Sugar on the grounds that there are no facts of Sugar's deliberate indifference.[26] Woods responds that he exhausted his administrative remedies and may proceed with the claim, but he did not address the merits of his claim. The Court has thoroughly reviewed Woods' medical records, and it does not support a finding that Sugar was deliberately indifferent to Woods' medical needs. Rather, it reflects that

---

[26] The record indicates that Woods filed several grievances complaining of lack of medical attention. The Court addresses the merits of the claim, while noting that Sugar is not specifically mentioned in any grievance the Court has been provided.

Sugar provided Woods treatment, both through regularly scheduled appointments and when she became aware of sick call requests made by Woods. When Sugar attempted to see Woods on his unit and found him in the shower, she did not see him. She did, however, order nurses to examine him that evening and a few days later wrote a prescription for him for other medication. Based upon the foregoing, a reasonable jury could not find deliberate indifference on the part of Sugar. Accordingly, the Court will grant Medical Defendants' Motion for Summary Judgment on this issue.

### 3. **Injections**

Woods alleges the individual Medical Defendants used wrong-sized needles when administering his injections and claims that the syringe could not hold the entire dose of medication. The record does not support a finding that incorrect syringes were used during Woods' course of treatment. Woods does not dispute that he received sufficient doses of medication. Moreover, his medical records reflect – as both Woods and Dr. McDonald, his treating physician, agree – that the Hepatitis C treatment was successful. A reasonable jury could not find for Woods on this issue.

Woods additionally claims that the individual Medical Defendants failed to rotate his Interferon injections, causing infection, sores, scarring, weakness, nausea, nose bleeds, jaundice, dizziness, and other complications. The individual Medical Defendants move for summary judgment on the grounds that Woods cannot show causation of injury and cannot establish that any of the symptoms of which he complains were caused by malfeasance, as opposed to being recognized and expected side effects of Interferon treatment. Woods responds that there is no genuine issue of fact that Defendants failed to act affirmatively to stop medical personnel from

15

injecting him in the same site. He argues that he produced several affidavits "testifying to his infection on his arm," as well as sick call slips and grievances supporting the fact.

It appears from the record that, for a period of time, Woods may have received injections in the same site. While it may have been negligent to fail to rotate the injection sites, the record does not reflect deliberate indifference by Medical Defendants. Rather, the record reflects that, when the issue was raised, steps were taken immediately to remedy the problem. Additionally, once Woods complained of arm pain, notes were placed in the record to alert the staff to rotate the injection site.

Although Woods argues that the record indicates infection resulted from injections at the same site, this is merely Woods' own repeated non-medical opinion regarding infection. Woods' medical records contain no indication of an infection *resulting from* his Interferon treatment. Notably, his treating physician, Dr. McDonald, states that at no time during his treatment did Woods suffer from an infection related to the treatment. Woods points to the order of the antibiotic Augmentin as evidence that there was an infection at the injection site. The record reflects, however, that the medication was prescribed after Woods presented with full lung fields, tender sinuses, shortness of breath, and sore throat. Sugar obtained a throat culture, and her notes indicate that she ordered the antibiotic to treat otitis and sinusitis.

With regard to Woods' numerous other complaints, Dr. McDonald's expert opinion is that with the exception of the nose bleeds, the conditions are side-effects attributable to the Interferon treatment. During his testimony, Woods acknowledged that Dr. McDonald advised him of that fact. Dr. McDonald was unable to determine the cause of the nose bleeds, but states that they were not caused by the failure to rotate the injection site. Woods produced no expert

16

testimony to refute Dr. McDonald's affidavit. A prisoner's claim of deliberate indifference to a serious medical need requires expert testimony when the seriousness of injury or illness would not be apparent to a lay person. *See Boring v. Kozakiewicz*, 833 F.2d 468, 473-74 (3d Cir. 1987); *see also Paith v. County of Washington,* 394 F. App'x 858 (3d Cir. Sept. 20, 2010) (not published). Here, Woods claims that the failure to rotate Interferon injections caused the side effects of which he complains and also caused infection. Whether the failure to rotate injection sites caused the conditions complained of by Woods or caused infection, and/or whether the medication itself caused these side-effects, is not readily apparent to a lay person. Woods offered no expert testimony to support his claim regarding the injection issue and, therefore, he cannot establish an essential element of his deliberate indifference claim. Based upon the record, a reasonable jury could not find for Woods on the issue. For the above reasons, the Court will grant Medical Defendants' Motion for Summary Judgment on this issue.

### 4. **Custom or Policy**

When a plaintiff relies upon a theory of respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates deliberate indifference. *See Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F.Supp. 1126, 1132 (D. Del. 1992). In order to establish that CMS is directly liable for the alleged constitutional violations, Woods "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (stating because respondeat superior or vicarious liability cannot be basis for liability under 42 U.S.C. § 1983, corporation

17

under contract with state cannot be held liable for acts of its employees and agents under those theories).

The Court has concluded that the individual Medical Defendants did not violate Woods' constitutional rights under the Eighth Amendment. CMS, therefore, cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating Woods's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. Jan. 19, 2007) (not published) (stating policy makers not liable for prison medical staff's alleged deliberate indifference to prisoner's serious medical needs where there was no underlying violation of prisoner's rights). Accordingly, the Court will grant Medical Defendants' Motion for Summary Judgment.

## V. **CONCLUSION**

For the above stated reasons, the Court will grant Medical Defendants' Motion for Summary Judgment and will deny Woods' Motion for Summary Judgment. An appropriate Order follows.